UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| JEROME PAGOS, | ) | |
| | ) | No. 13 CV 4430 |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Magistrate Judge Young B. Kim |
| | ) | |
| CAROLYN W. COLVIN, Acting Commissioner, Social Security Administration, | ) ) ) | |
| | ) | March 27, 2015 |
| Defendant. | ) | |

**MEMORANDUM OPINION and ORDER**

Former truck driver Jerome Pagos seeks disability insurance benefits ("DIB") based on his claim that a 2007 on-the-job vehicle accident left him with a back injury that renders him completely unable to work. After the Appeals Council declined to review an administrative law judge's ("ALJ") decision denying his application, Pagos filed this suit seeking judicial review. *See* 42 U.S.C. § 405(g). Before the court are the parties' cross motions for summary judgment. For the following reasons, Pagos's motion for summary judgment is granted and the government's motion is denied:

**Procedural History**

In October 2009 Pagos filed an application for a period of disability and DIB, claiming a disability onset date of May 29, 2007. (Administrative Record "A.R." 145.) After his claim was denied initially and upon reconsideration, (id. at 86-90, 92-95), Pagos requested and was granted a hearing before an ALJ. That hearing

took place on January 5, 2012. (Id. at 37-79.) On January 26, 2012, the assigned ALJ denied Pagos's application. (Id. at 32.) The Appeals Council declined review, (id. at 1-6), making the ALJ's decision the final decision of the Commissioner of Social Security, *see Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). Pagos then filed this lawsuit seeking judicial review of the Commissioner's decision, *see* 42 U.S.C. § 405(g), and the parties consented to this court's jurisdiction. *See* 28 U.S.C. § 636(c); (R. 11).

**Facts**

On May 29, 2007, Pagos was driving a truck painting lines on a highway when his vehicle was hit from behind by a truck traveling 50 miles per hour. (A.R. 257.) He suffered strains of his lumbar and cervical spine and multiple contusions. (Id. at 259.) Over the coming months he suffered from pain that was not alleviated by medicine, physical therapy, or epidural injections, so in September 2008 he underwent lumbar disc decompression surgery. (Id. at 284.) Despite the surgery he continued to complain to his treating physician of debilitating pain, and his treating physician routinely characterized him as being unable to work. (See, e.g., id. at 325, 330-31, 334, 344, 350, 357, 360, 366, 387, 390, 394.) That changed abruptly in March 2010 when Pagos insisted on going back to work despite his daily pain. (Id. at 569.) He worked as a truck driver from March 11, 2010, until March 1, 2011, when he was fired after failing a work-related drug test. (Id. at 28, 596.) Because his year of work amounted to substantial gainful activity after his claimed disability onset date, Pagos's attorney asked the ALJ at Pagos's hearing to consider

a closed period of disability excluding the period from March 11, 2010, through March 1, 2011. (Id. at 78.) At that hearing, Pagos presented documentary and testimonial evidence to support his disability claim.

**A.     Medical Evidence**

Pagos's medical records show that within a week of receiving emergency care to treat the injuries he sustained in the May 2007 vehicle accident, he began seeking regular treatment from an orthopedic practice identified as Midwest Sports Medicine & Orthopaedic Surgical Specialists Ltd. (A.R. 303.) During his first few visits to the practice, Dr. Mary Morell examined Pagos and noted that he had marked tenderness to palpation of the cervical paraspinal muscles, tenderness just along the lower lumbar paraspinal muscles, and decreased range of motion and forward flexion. (Id. at 304-05.) Dr. Morell also noted that the pain medication Pagos had been prescribed was giving him little relief, so she increased his dosage and ordered an MRI. (Id. at 305.) At a follow-up appointment two weeks later, Dr. Morell noted that Pagos still had tenderness in his spine along with "palpable spasms." (Id. at 306.) In July 2007 Dr. Morell again examined Pagos and observed tenderness in his paraspinal muscles and with forward flexion. (Id. at 310.) By then he had undergone a spinal MRI which showed cervical strain with bulging discs, thoracic strain, aggravated T5-T6 compression fractures, and lumbar strain with bulging discs. (Id. at 311.) By the end of July 2007, Pagos had developed an antalgic gait and was still having difficulty managing his pain even with a Vicodin

prescription. (Id. at 312.) Dr. Morell registered her concerns about Pagos's "failure to progress" and referred him to her colleague, Dr. Bruce Montella. (Id.)

From August 2007 through March 2010, Dr. Montella saw Pagos on a near monthly basis, undertaking physical examinations, prescribing medicines, administering epidural injections, and performing back surgery. During their first visit in August 2007, Dr. Montella examined Pagos and observed him to have pain to palpation and a limited range of motion in his lumbar and cervical spine. (Id. at 317-18.) He prescribed physical therapy and anti-inflammatories and noted "I think that it is unreasonable for him to participate at work in any way at this time." (Id. at 318.) This is a phrase that Dr. Montella would repeat with minor variances in most of his treatment notes for the next two and a half years.

Although Dr. Montella's notes did not always include objective evidence in the form of physical examination or test results to support his opinions regarding Pagos's ability to work, in some cases they did. In September 2008 Dr. Montella noted that Pagos had a limited range of lumbar motion and tenderness to palpation in his spinal muscles. (Id. at 282.) In August 2009 Dr. Montella wrote that a relevant review of systems revealed no change in his condition and that a spine examination showed definite improvement with no new problems. (Id. at 416.) That changed by the next visit in December 2009, when Pagos presented with a limited range of motion, decreased motor function, and positive straight-leg tests. (Id. at 575-76.) He noted similar symptoms in February and March 2010. (Id. at 569, 572.) His physical therapist noted similar findings, charting that Pagos

4

presented with muscle guarding, problems with flexibility, poor posture, reduced strength, and an altered gait. (Id. at 289.) On the occasions where Dr. Montella saw Pagos but did not include the specific results of a physical examination in his notes, he often wrote that Pagos's "physical exam is unchanged from previous visits." (See, e.g., id. at 418-39.)

Dr. Montella tried various forms of treatment for Pagos's back pain, with limited success. He prescribed a long-term course of low-dose narcotics to try to give Pagos the relief he needed to rest at night. (Id. at 334, 357.) In September and December 2007 and January 2008 he gave Pagos epidural injections. (Id. at 327, 339, 341, 347.) By August 2008 Pagos was ready to try a "last resort" surgical treatment option. (Id. at 372.) Dr. Montella performed a lumbar disc decompression surgery and diskography in September 2008, and although his surgery and recovery went reasonably well, in October 2008 Pagos reported that he was still experiencing a lot of pain. (Id. at 284, 381, 387.)

Other than the records from Drs. Morell and Montella, the remaining medical evidence relevant to the closed period comes from consulting physicians who evaluated Pagos or his file. On February 1, 2010, consulting physician Dr. Ravikiran Tamragouri examined Pagos and observed that he ambulated with a hunched back because of pain, but he did not use an assistive device. (Id. at 539-40.) He noted that Pagos had some difficulty getting on and off of the examination table but had normal strength in his upper and lower extremities. (Id. at 540-41.) Nine days later consulting physician Dr. Vidya Madala reviewed Dr. Tamragouri's

5

report and concluded that Pagos has the residual functional capacity ("RFC") to sit, stand, or walk for six hours in an eight-hour day, to occasionally lift 50 pounds and frequently lift 25 pounds, and to occasionally stoop and crouch. (Id. at 544-45, 550.) Dr. Madala also wrote that Pagos "is considered only partially credible as the medical findings do not support the degree of functional limitation reported by the claimant." (Id. at 550.) In September 2010 Disability Determination Services evaluating physician Dr. Raynaldo Gotanco affirmed the RFC, but wrote that Pagos "has objective evidence of lumbar and cervical disc herniation so that he is credible." (Id. at 587.)

The medical record shows that after months of charting that Pagos was restricted from any work, in March 2010 Dr. Montella abruptly released him to work without restrictions as of April 1, 2010. (Id. at 569-70.) Dr. Montella wrote that there was "significant improvement" in Pagos's symptoms since his last visit. (Id. at 569.) That statement appears to be predicated on Pagos's report that he still has daily pain but wants to go back to work. (Id.) Dr. Montella noted that he saw no signs of incongruency or malingering, and despite observing that Pagos still had a limited range of motion, reduced motor function, and positive straight-leg tests, he released him to begin working on April 1, 2010. (Id.) Pagos returned to work, but in February 2011 he visited Dr. Montella complaining of worsening symptoms. (Id. at 610.) Dr. Montella observed that Pagos still had paraspinal tenderness, positive straight-leg tests, and a decreased range of motion. (Id. at 610-11.) The following month, in March 2011, Pagos's employer terminated him after he tested positive for

6

cocaine use. Dr. Stephen Behnke, who had periodically treated Pagos for anxiety and depression, wrote a letter acknowledging the positive cocaine screen but stating that antibiotics and the anxiety medicine he had prescribed Pagos were known to produce false positives. (Id. at 596.)

B.  **Pagos's Hearing Testimony**

During his January 2012 hearing, Pagos fielded questions from the ALJ regarding his failed drug test in 2011. (A.R. 43-44.) Pagos testified that he believed it was a false positive result for cocaine, but said that the drug test was "not the 100-percent reason why I'm not working." (Id. at 44.) He said that he had demanded that his doctor release him for work in March 2010 because he could not handle just sitting around and he wanted to be part of society because that was "the man thing to do" and how he "was raised." (Id. at 44, 47, 64.) Pagos emphasized that his doctor signed the work release only reluctantly. (Id. at 44.) He admitted that the date he returned to work coincided with the end of workers' compensation payments he had received on a bi-weekly basis after his 2007 accident. (Id. at 46-47.) But he also said that after he returned to work he was able to use between 38 and 40 days of accumulated leave to take time off. (Id. at 48-49.) He used those days to try to recover from the pain of driving his truck. (Id.)

In describing his daily activities, Pagos said that he still drives a car when necessary but uses a handicap parking permit. (Id. at 45-46.) He said he lives alone and spends most of his day lying down. (Id. at 40, 49.) Pagos testified that he lets chores go undone for as long as he can and only gets up to do something when

7

he has to go to the store or pick up his son once a week. (Id. at 51.) He said he carries his own groceries because he has no choice and keeps the bags to no more than four or five pounds each. (Id.) Pagos testified that he has more bad days than good days and on bad days he is unable to get out of bed. (Id. at 52.)

**C.    The Medical Expert's Testimony**

The ALJ elicited testimony from medical expert Dr. Sheldon Slodki, who agreed with Dr. Madala's RFC determination. (A.R. 59.) Dr. Slodki observed that Pagos's primary problem is pain and testified that "[t]he problem with pain is that it's not objective; it's subjective. And the determination is primarily credibility, and that's reserved for the commissioner." (Id.) Dr. Slodki testified that it is possible that Pagos's injuries cause the level of pain he describes, but emphasized that he "only can testify on objective evidence." (Id. at 60.)

**D.    The Vocational Expert's Testimony**

The ALJ called Vocational Expert Aimee Mowery to testify regarding the kinds of jobs a person with certain hypothetical limitations could perform. When asked about the kind of work available to someone with postural limitations including no climbing ladders, ropes, or scaffolding, and only occasional stooping and crouching, Mowery testified that such a person could perform "pretty much a full range of unskilled, light work." (A.R. 76.) When Pagos's attorney asked the ALJ whether the "hypothetical is based on a person with the abilities of the claimant after 04/01/2010," the ALJ agreed with that characterization. (Id.) Accordingly Pagos's attorney asked the ALJ if it would simplify things to agree to a

8

closed period, and the ALJ responded that he needed to review his notes before deciding. (Id. at 77.) Before the hearing ended, Pagos's attorney emphasized his stipulation to a closed period and asked the ALJ to find Pagos disabled during the closed period excluding the period of his return to work. (Id. at 78.)

**E.    The ALJ's Decision**

On January 26, 2012, the ALJ issued a decision finding that Pagos had not been under a disability between May 29, 2007, and the date of his decision. (A.R. 32.) In applying the standard five-step sequence for assessing disability, *see* 20 C.F.R. § 404.1520(a)(4); *Schomas*, 732 F.3d at 706-07, the ALJ found at step one that Pagos had engaged in substantial gainful activity between March 11, 2010, and March 1, 2011, but that there had been a continuous 12-month period during which he did not engage in such activity.[1] (A.R. 28.) At step two the ALJ found that Pagos suffers from severe impairments in the form of status post motor vehicle accident, cervical, thoracic, and lumbar strain, and chronic pain. (Id.) After determining at step three that none of Pagos's impairments meet or equal listings severity, the ALJ concluded that Pagos retains the RFC to perform light work "with no ladder, rope or scaffold climbing and no more than occasional stooping or crouching." (Id. at 29.) In explaining that decision the ALJ wrote that he gave no weight to what he described as Dr. Montella's "conclusory" opinions. (Id. at 30.)

---

[1] Although the ALJ did not specify the dates of this "continuous 12-month period," less than 12 months passed between the date on which Pagos stopped working in 2011 and the ALJ's decision. It therefore can be inferred that the ALJ is referencing the closed period between Pagos's claimed disability onset date (May 29, 2007), and the date he returned to work (March 11, 2010). (See A.R. 28, 32.)

9

The ALJ also found Pagos only partially credible. Turning to steps four and five, the ALJ concluded that although Pagos is unable to perform his past relevant work as a truck driver, considering his age, education, work experience, and RFC in conjunction with the Medical Vocational Guidelines, *see* 20 C.F.R. Part 404, Subpart P, App. 2, there are jobs that exist in significant numbers in the national economy that Pagos can perform. (Id. at 31.) Accordingly, the ALJ concluded that Pagos is not disabled and denied his DIB application. (Id. at 32.)

**Analysis**

In challenging the Commissioner's decision, Pagos argues that the ALJ erred in giving no weight to Dr. Montella's opinions regarding his ability to work during the closed period, in failing to perform an adequate credibility analysis, and in explaining his step-five conclusion in a way that is inconsistent with the VE's testimony. This court will reverse the Commissioner's decision only if it is unsupported by substantial evidence or rests on an error of law. *See* 42 U.S.C. § 405(g); *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Substantial evidence is that which "a reasonable mind might accept as adequate to support the conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). In the course of its review the court considers "the record as a whole but does not attempt to substitute its judgment for the ALJ's by reweighing the evidence, resolving material conflicts, or reconsidering facts or the credibility of witnesses." *Beardsley v. Colvin*, 758 F.3d 834, 836-37 (7th Cir. 2014). The court will remand, however, where the ALJ ignores entire lines of evidence, *see*

*Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003), or fails to build an accurate and logical bridge between the evidence and conclusion, *see Beardsley*, 758 F.3d at 837.

Pagos's strongest argument is his contention that the ALJ erred by refusing to give any weight to Dr. Montella's recurring opinion that Pagos was unable to work during the closed period, despite the longevity and closeness of their treating relationship. Beginning in August 2008 and in almost all of his treatment notes through March 2011, Dr. Montella wrote some version of the phrase "I think that it is unreasonable for [Pagos] to participate at work in any way at this time." (See, e.g., A.R. 325, 330-31, 334, 344, 350, 357, 360, 366, 387, 390, 394.) In July 2009 Dr. Montella wrote that "I am in support of his permanent and total disability application." (Id. at 418.) In crafting the RFC, the ALJ acknowledged Dr. Montella's opinions stating that Pagos was unable to engage in work activity, but cast them aside with the following three sentences:

> [T]here was never any function by function analysis of the claimant's capabilities and no objective support for the claimant's disability. Without such evidence and reasoning, these conclusory opinions cannot be accorded any weight. Furthermore, the records show that the claimant received temporary disability from the State of Illinois, which is likely what the doctor was writing in favor of.

(Id. at 30.) Pagos argues that none of those reasons justify the ALJ's decision to reject Dr. Montella's opinions regarding his fitness for work during the closed period.

As the government points out and Pagos concedes, Dr. Montella's recurring opinion that Pagos was unable to work during the closed period is not a treating

physician's "medical opinion" that might be entitled to controlling weight, because it addresses a question that is reserved to the Commissioner. *See* 20 C.F.R. § 404.1527(d)(1); SSR 96-5p, 1996 WL 374183, at *2 (July 2, 1996); *Dixon v. Massanari*, 270 F.3d 1171, 1177 (7th Cir. 2001) ("[A] claimant is not entitled to disability benefits simply because her physician states that she is 'disabled' or unable to work."). But as the Agency's own policy interpretations and numerous binding court decisions make clear, "opinions from any medical source on issues reserved to the Commissioner must never be ignored." SSR 96-5p, 1996 WL 374183, at *3; *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013); *Roddy v. Astrue*, 705 F.3d 631, 638 (7th Cir. 2013); *Bjornson v. Astrue*, 671 F.3d 640, 647-48 (7th Cir. 2012). Although a doctor's opinion regarding the claimant's ability to work is not entitled to any "special significance," the ALJ is required to consider it and to review all of the medical findings or other evidence supporting the doctor's opinion. 20 C.F.R. § 404.1527(d)(1), (3); *Garcia*, 741 F.3d at 760.

Contrary to Pagos's argument, here the ALJ did not ignore Dr. Montella's opinion that Pagos was disabled during the closed period. Instead, he considered the evidence but gave it no weight, for three reasons. First, the ALJ faulted Dr. Montella for providing no "function by function analysis of the claimant's capabilities." (A.R. 30.) This statement is puzzling because just as the question whether a claimant is disabled is reserved to the Commissioner, the question of what a claimant can do despite his limitations is also exclusively within the ALJ's purview. *See* 20 C.F.R. § 404.1527(d)(2) (noting that the final responsibility of

crafting the RFC is reserved to the Commissioner); *Bates v. Colvin*, 736 F.3d 1093, 1102 n.4 (7th Cir. 2013) (noting that physician's opinion regarding what claimant can or cannot do in given day is not a "medical opinion" to which the ALJ must defer). Accordingly, the regulations do not require a treating physician to provide a function-by-function analysis in order to procure the ALJ's deference. *Burnam v. Astrue*, No. 10 CV 5543, 2012 WL 710512, at *15 (N.D. Ill. Mar. 5, 2012); *see also* SSR 96-2p, 1996 WL 374188, at *1 (July 2, 1996). Because a function-by-function analysis is not required, Dr. Montella's failure to provide one does not lend logical support to the ALJ's decision to discard his opinions. And in any event, where an ALJ is unable to determine whether a doctor who considers the claimant disabled was "acquainted with the full range of jobs that a person with [the claimant's] ailments could fill," the ALJ should ask "the doctor to specify more exactly what 'functions' [the claimant] is incapable of performing." *Garcia*, 741 F.3d at 760. If the ALJ thought that Dr. Montella's opinion lacked clarity based on the absence of a function-by-function analysis, he should have sought that clarification. *See id.*

The second reason the ALJ gave for casting aside Dr. Montella's notes is that, according to him, there is "no objective support for the claimant's disability." (A.R. 30.) That reason ignores the fact that there are objective and clinical findings riddled throughout Dr. Montella's notes from the closed period. Those notes include at least four instances in which Dr. Montella provided details regarding physical examinations in which he found Pagos to have, at various times, pain to palpation of his paraspinal muscles, limited range of motion, and difficulty flexing. (Id. at

13

282, 569, 572, 575-76.) On occasions when Dr. Montella did not provide that level of detail, he wrote that Pagos's physical examination was unchanged from the previous visit, indicating that he performed a physical examination but had no new findings to chart. (See, e.g. 418-39.) Dr. Montella relied on MRI results to assess his lumbar disc pathology. (Id. at 282.) His notes include the clinical details of the 2008 lumbar disc decompression surgery he performed on Pagos when narcotics and epidural injections failed to relieve his pain. (Id. at 284.) The presence of all of these objective bases for Dr. Montella's opinions cannot be squared with the ALJ's assertion that there is "no objective support" for his conclusions. (Id. at 30.)

The third and final reason the ALJ gave for rejecting Dr. Montella's opinions is his speculation that Dr. Montella was "likely" writing his notes in favor of Pagos's application for temporary disability from the State of Illinois. (Id.) It is unclear why, even if true, that distinction matters, and the ALJ did not explain why he believes it does. The government defends this reason by pointing out that Pagos was eligible for temporary disability benefits from the state of Illinois on the basis of his inability to return to his former job, whereas he is only entitled to benefits under the Social Security Act if he is unable to perform any work. (R. 19, Govt.'s Resp. at 4.) That is of course true, *see Stephens v. Heckler*, 766 F.2d 284, 285 (7th Cir. 1985), but nothing in Dr. Montella's notes suggests that he thought that Pagos could perform other jobs. He repeatedly wrote that it was unreasonable to expect Pagos to "participate at work in any way," (see, e.g., A.R. 318, 325, 330-31, 357, 366, 387, 400), and beginning in the spring of 2009 he repeatedly wrote that he was in

support of Pagos's application for "permanent disability," (id. at 410, 418, 420). Moreover, throughout the closed period Dr. Montella signed work restrictions on Pagos's behalf. Those work restriction orders included spaces for the doctor to release the patient to work with restrictions in activities such as climbing, pulling, or lifting. (See, e.g., id. at 323, 326, 335, 346, 351, 355, 374.) Dr. Montella consistently checked the box for "no work until further evaluation" rather than allowing him to return to work with any of the pre-determined restrictions. (Id.) Accordingly, to the extent the ALJ was suggesting that Dr. Montella only meant to restrict Pagos from working as a truck driver, that suggestion is unsupported by the evidence. In light of the absence of a logical bridge spanning the gap between Dr. Montella's notes and the ALJ's decision to lend them no weight, the court is unable to find that the assigned RFC is supported by substantial evidence. *See Beardsley*, 758 F.3d at 837. Accordingly, the case must be remanded for further proceedings.

Pagos's remaining arguments do not persuade this court that the ALJ engaged in any additional reversible errors. Pagos challenges the ALJ's credibility analysis, but in his opening brief he argues only that the ALJ erred by using the frequently criticized, "backwards" boilerplate language stating that "the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above [RFC] assessment." (A.R. 30.) Although Pagos is correct that this language is meaningless and unhelpful, *see Bjornson*, 671 F.3d at 645-46, an ALJ's reliance on

15

that language only amounts to reversible error in situations where the ALJ fails to provide other reasons that are grounded in the evidence, *see Filus v. Astrue*, 694 F.3d 863, 868 (7th Cir. 2012). After the government made that point in its response, in his reply brief Pagos argues that the ALJ erred by overemphasizing Pagos's daily activities and by ignoring a non-examining physician's finding that his allegations are credible. (R. 21, Pl.'s Reply at 7.) But Pagos still has not addressed the ALJ's explanations that he found Pagos less than credible based on: (1) the timing of his decision to return to work coinciding with the discontinuation of his state disability payments; and (2) the fact that he stopped working only after being fired for failing a drug test. (A.R. 30.) Those reasons are grounded in the evidence, and accordingly, this court will not find that the ALJ's credibility assessment is patently wrong. *See Filus*, 694 F.3d at 869.

Finally, Pagos argues that the ALJ's application of the Medical-Vocational Guidelines at step five was inconsistent with and unsupported by the VE's testimony. That argument takes two forms. First, Pagos points to the VE's testimony that a person with Pagos's RFC would be able to perform "pretty much a full range of unskilled light work," and argues that because Pagos's attorney asked the ALJ in a follow-up question whether that hypothetical is based on a person with his abilities after April 2010, and because the ALJ said yes, there is no evidence regarding what kind of work he could perform before April 2010. (R. 10, Pl.'s Br. at 13; R. 21, Pl.'s Reply at 8-9.) But that argument is inconsistent with the VE's role. The VE's job is to provide information regarding the kinds of work a hypothetical

16

person with certain limitations can perform, not to opine as to whether a particular claimant could perform any work during a specific period in his medical history. *See* HALLEX I-2-6-74, Testimony of a Vocational Expert, 1993 WL 751902 (12/12/13) ("The ALJ will not permit the VE to respond to questions on medical matters or to draw conclusions not within the VE's authority, e.g., the VE may not provide opinions regarding the claimant's [RFC] or the resolution of ultimate issues of fact or law."). The ALJ here may have confused that issue by agreeing with Pagos's attorney's characterization of the hypothetical, but that does not change the fact that what the ALJ asked, and the information the VE provided, pertains to a hypothetical individual with a given RFC, not to Pagos's condition during a specific time frame. Accordingly, Pagos's assertion that "there was no VE testimony regarding the individual's abilities to perform any job prior to 4/1/10" mischaracterizes the VE's position and the ALJ's decision process. (See R. 10, Pl.'s Br. at 14.)

Pagos's second tack with respect to the VE's testimony is murkier, but he appears to argue that the ALJ erred in failing to resolve what he characterizes as a conflict between the VE's testimony and the Dictionary of Occupational Titles ("DOT"). Although it is the ALJ's affirmative duty to ask whether a VE's testimony squares with the DOT, his failure to do so amounts to reversible error where there is a conflict that is left unresolved. SSR 00-4p, 2000 WL 1898704, at *4 (Dec. 4, 2000); *Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009). Where the claimant's attorney fails to identify the conflict during the hearing, the ALJ's failure to

17

recognize a conflict only matters if it was an apparent conflict, meaning it was "obvious enough that the ALJ should have picked up on [it] without any assistance." *Overman v. Astrue*, 546 F.3d 456, 463 (7th Cir. 2008). Here, it is unclear from Pagos's brief that any conflict exists, let alone an apparent one. Pagos apparently believes there is a conflict between the VE's testimony that a person with his RFC could perform "pretty much a full range of light work" and the ALJ's decision to apply the Medical-Vocational Guidelines (or the "grid") to find him not disabled. But the Medical-Vocational Guidelines are set forth in the Agency's regulations, not the DOT. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 2. If the DOT does not address an issue, there can be no apparent conflict between the DOT and the VE's testimony on that issue. *See Zblewski v. Astrue*, 302 Fed. App'x 488, 494 (7th Cir. 2008). If Pagos means to argue that the VE's testimony is inconsistent with the ALJ's application of the grid, the grid "specifically provides for the case where the individual has nonexertional complaints by requiring that the ALJ consider the nonexertional impairment to see if the individual's work capability is further diminished than the grid otherwise would indicate." *Clark v. Sullivan*, 891 F.2d 175, 178 (7th Cir. 1989). Here, the ALJ elicited testimony from the VE explaining that a person with Pagos's RFC, including his nonexertional limitations, would be able to perform "pretty much the full range of unskilled, light work." (A.R. 76.) The ALJ properly relied on that testimony to conclude that Pagos could perform work as set out in the grid. (Id. at 32); 20 C.F.R. § 404 Subpt. P, App. 2, § 200.00(e) & Rule 202.21. For all of

these reasons, Pagos has not shown that the ALJ erred in the course of his step-five analysis.

## Conclusion

For the foregoing reasons, Pagos's motion for summary judgment is granted, the Commissioner's is denied, and the case is remanded to the agency for further proceedings consistent with this opinion.

**ENTER:**

_____
**Young B. Kim**
**United States Magistrate Judge**